COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-021-CR

KATHERINE WISEMAN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM COUNTY CRIMINAL COURT NO. 3 OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Katherine Wiseman appeals the trial court’s denial of her motion to suppress, after which she pled nolo contendere to driving while intoxicated (“DWI”) pursuant to a plea bargain, for which she received twenty months’ community supervision and a $500 fine.  Appellant contends that the trial court erred when it denied her motion to suppress, based on her Fourth Amendment right to be free from unreasonable seizure.  We affirm.

BACKGROUND

Just after midnight on April 11, 2005, a Carrollton police officer, Brian Box, noticed Appellant’s Ford Explorer (“SUV”) as he drove past an apartment complex during his patrol.  The SUV had its hazard lights turned on and was parked against the curb in the main driveway of the apartment complex’s parking lot, in which multiple vehicles were parked.
(footnote: 2)  Officer Box acknowledged that the complex was not in a high crime or high drug-traffic area.  Appellant and two passengers were in the SUV.

As he drove by, Officer Box looked into the parking lot and saw someone’s legs partially protruding from the SUV’s open right rear passenger door.
(footnote: 3)  Officer Box decided to turn around, to “see if they were stranded and needed any assistance.”  He indicated that he “[c]ouldn’t tell exactly what they were doing, but the legs were out of the vehicle facing sideways.”

When Officer Box completed a U-turn about a block south, entered the apartment complex, and turned on the lights on his patrol car
(footnote: 4) so that approaching traffic could see his vehicle, the rear passenger was back in the SUV.  Officer Box testified that at the point he pulled up behind the SUV, he “did not know anything about the vehicle other than the fact that it had its hazard lights on.”  After Officer Box pulled up behind it, the SUV moved twenty to thirty feet forward and turned left into a parking space.  Officer Box testified that he continued pulling forward, into a position where he could make contact with Appellant, the driver.

Officer Box called in the SUV’s license plate to dispatch;
(footnote: 5) he testified that at this point, he was concerned about whether the SUV was operational and able to move.  As he approached the SUV,
(footnote: 6) he saw a puddle of vomit close to the rear passenger’s location.
(footnote: 7)  He also noticed some vomit protruding from the rear passenger’s window back to the rear tire, and down over the SUV’s passenger side running board.  However, he did not see anyone throw up, nor did he see any signs of distress to indicate anything worse than an upset stomach.  After seeing the vomit, he expanded his purpose to include checking to see if anyone in the SUV needed medical attention.

Appellant was the first person Officer Box approached, and upon contact with her, he saw signs of intoxication and proceeded with a DWI investigation. This led to her arrest for DWI.  At the trial court’s suppression hearing on November 2, 2005, Appellant argued that Officer Box violated her Fourth Amendment rights by stopping and detaining her without a warrant,
(footnote: 8) reasonable suspicion for a stop, or satisfying the community caretaking exception, which resulted in her subsequent arrest for DWI.  Officer Box was the sole witness to testify at Appellant’s suppression hearing.

The trial court limited the suppression hearing to a discussion of the community caretaking exception, stating, “This is not a reasonable suspicion, criminal activity abound or that type of stop.”  The trial court denied the motion to suppress, but upon Appellant’s conviction, certified her right of appeal.

DISCUSSION

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. C
onst
. amend. IV.  To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct.
  Ford v. State
, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).  A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant.  
Id
. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable.  
Id
.  It is undisputed that the interaction between Appellant and Officer Box was made without a warrant. 

Standard Of Review

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).  Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
Best
, 118 S.W.3d at 861-62.  However, when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.  
Johnson
, 68 S.W.3d at 652-53.

When the trial court does not make explicit findings of historical facts, as in the instant case, we review the evidence in the light most favorable to the trial court’s ruling and assume the trial court made implicit findings of fact supporting its ruling, so long as those findings are supported in the record.
(footnote: 9)  
Carmouche
, 10 S.W.3d at 327-28.  
In determining whether a trial court’s decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later.  
Rachal v. State
, 917 S.W.2d 799, 809 (Tex. Crim. App.), 
cert. denied
, 519 U.S. 1043 (1996).

The trial court limited the suppression hearing to the community caretaking exception, implicitly finding that this was a “stop,” rather than an “encounter,” for Fourth Amendment purposes.  There appeared to be no dispute at the suppression hearing with regard to the pertinent facts.  The trial court denied Appellant’s motion to suppress, indicating that because Appellant had turned on the SUV’s hazard lights in the apartment complex driveway, at midnight, the officer would have been remiss if he had failed to stop and see whether something was wrong; therefore, under the community caretaking exception, the officer acted reasonably in making an investigative stop.

Because the trial court found Officer Box’s testimony sufficient to establish that the community caretaking exception applied, its ruling was an application of law to fact that did not turn on the witness’s credibility and demeanor. 
 See Guzman
, 955 S.W.2d at 89; 
State v. Bryant
, 161 S.W.3d 758, 761 (Tex. App.—Fort Worth 2005, no pet.).  Therefore, we review de novo the trial court’s order denying the motion to suppress, to determine whether, on these facts, the initial contact between Appellant and Officer Box was an “encounter,” which would not implicate the Fourth Amendment, and if not, whether the community caretaking exception was properly applied under these circumstances.

Investigative Detention

Appellant argues that her initial contact with Officer Box was a Fourth Amendment “stop,” and that without a valid warrant or warrant exception, her motion to suppress should have been granted.  The State counters that Appellant’s motion to suppress was properly denied, characterizing Officer Box’s initial interaction with Appellant as an “encounter,” which, as a matter of law, would fail to implicate the Fourth Amendment’s protections.

The Texas Court of Criminal Appeals has recognized three categories of interactions between police officers and citizens: encounters, investigative detentions, and arrests.  
State v. Perez
, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002).  Unlike investigative detentions and arrests, which are seizures for Fourth Amendment purposes, an encounter is a consensual interaction, which the citizen is free to terminate at any time. 
 Bryant
, 
161 S.W.3d at 761;
 See Gurrola v. State
, 877 S.W.2d 300, 302-03 (Tex. Crim. App. 1994).  The dispositive question is whether the totality of the circumstances shows that the police conduct at issue would have caused a reasonable person to believe that she was free to decline the officer’s requests or otherwise terminate the encounter.  
Florida v. Bostick
, 501 U.S. 429, 439-40, 111 S. Ct. 2382, 2389 (1991); 
State v. Velasquez
, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999); 
Johnson v. State
, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995); 
see also California v. Hodari D.
, 499 U.S. 621, 627-28, 111 S. Ct. 1547, 1551-52 (1991); 
Terry v. Ohio
, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 (1968).  If so, or when the individual’s freedom of movement is restricted by a factor independent of police conduct, the interaction is a police-citizen “encounter.”  
United States v. Drayton
, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002); 
Bostick
, 501 U.S. at 436, 111 S. Ct. at 2387;
 Florida v. Royer
, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 1324 (1983); 
see also Velasquez
, 994 S.W.2d at 679.
(footnote: 10) 
 A seizure occurs when a reasonable person would believe he or she was not free to leave and has yielded to a show of authority or has been physically forced to yield.  
Hodari D
., 499 U.S. at 627-28, 111 S. Ct. at 1551-52; 
Johnson
, 912 S.W.2d at 236. 

An officer’s stop of an automobile constitutes a seizure within the meaning of the Fourth Amendment.  
Corbin v. State
, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002); 
see also Delaware v. Prouse
, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); 
Garza v. State
, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989).  In 
Corbin
, the court of criminal appeals held that a seizure occurred when the driver pulled over in response to the officer’s activation of his overhead lights.  85 S.W.3d at 276-76
.  The officer then approached the car and asked the driver to step out.  
Id
. at 275.

The fact that a car is already stationary when an officer pulls up behind it is not dispositive as to whether a seizure has occurred.  
See Garza
, 771 S.W.2d at 556. 
 But see Stewart v. State
, 603 S.W.2d 861, 862 (Tex. Crim. App. 1980) (stating that van was not stopped by officers because it was already stationary when they approached).
(footnote: 11)  When a person voluntarily approaches a police officer, this is an encounter. 
 See Stewart
, 603 S.W.2d at 862 (stating initial contact was an encounter when driver got out of the van without being requested to do so).

Here, Appellant’s SUV was stationary, but then she pulled it into a parking space in response to Officer Box’s pulling his patrol car with its lights on up behind her.  This is unlike cases in which a vehicle is stationary when the police arrive, and stays stationary after a police car pulls in behind it.  
See Garza
, 771 S.W.2d at 556.  Once Appellant pulled into the parking space and Officer Box positioned his patrol car with its lights on to make contact with her, she no longer had freedom to depart; therefore, she was effectively detained. 
 See Bostick
, 501 U.S. at 436-37, 111 S. Ct. at 2387.

Community Caretaking Exception 

Whether a search or seizure is reasonable is a question of law that we review de novo.  
Kothe v. State
, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004).  Reasonableness is measured by examining the totality of the circumstances.  
Id
. at 63.  It requires a balancing of the public interest and the individual’s right to be free from arbitrary detentions and intrusions.  
Id
.  When police-citizen contact rises to the level of a seizure, it must be supported by reasonable suspicion, probable cause, or the community caretaking exception.  
Corbin
, 85 S.W.3d at 276. 

Appellant argues that her motion to suppress should have been granted because these circumstances fail to satisfy the community caretaking exception’s requirements.  The State argues the contrary.

The community caretaking exception allows police officers, as part of their duty to “serve and protect,” to stop or temporarily detain an individual whom a reasonable person would believe is in need of help, given the totality of the circumstances.  
Wright v. State
, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999); 
see Cady v. Dombrowski
, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973).  This exception is to be narrowly applied. 
 Wright
, 7 S.W.3d at 152.

To invoke the community caretaking exception, an officer’s primary motive must be concern for the individual’s well-being. 
 Corbin
, 85 S.W.3d at 277. Here, the record reflects that Officer Box was not sure if anyone in the SUV needed help, but he was concerned that they might have been stranded because they had activated the SUV’s hazard lights.  We conclude that the trial court, as the exclusive judge of credibility and finder of fact, could have found that Officer Box was primarily motivated by community caretaking concerns when he made the decision to turn around and check on the SUV and its occupants.  
See id.  
(citing 
Ross
, 32 S.W.3d at 855).

Next, 
we must determine whether Officer Box acted reasonably in stopping Appellant to render assistance.  To do this, we consider the following nonexclusive factors, in light of the facts available to the officer when he stopped Appellant: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone, had access to assistance independent of that offered by the officer, or both; and (4) to what extent the individual—if not assisted—presented a danger to himself or others.  
Wright
, 7 S.W.3d 
at 151-52; 
see Terry
, 392 U.S. at 21-22, 88 S. Ct. at 1880; 
Wright v. State
, 18 S.W.3d 245, 247 (Tex. App.—Austin 2000, pet. ref’d).

“Because the purpose of the community caretaking exception is to allow an officer to ‘seize’ and assist an individual whom he reasonably believes is in need of help, the first factor is entitled to the greatest weight.”  
Corbin
, 85 S.W.3d at 277.  The greater the nature and level of distress exhibited, the more likely the police involvement will be a reasonable exercise of the community caretaking exception.  
Id
.  The remaining three factors give definition to the first factor, and a particular level of exhibited distress may be seen as more or less serious depending on their presence or absence.  
Id.

Appellant argues that on these facts, the nature and level of distress exhibited to Officer Box when he made his decision to turn around and enter the complex was insufficient to justify applying the community caretaking exception.  The State asserts that Officer Box acted reasonably on his assumption that the SUV’s occupants needed his assistance.

In 
Wright
, a police officer on the highway at 4 a.m. saw the rear  passenger of a moving car lean out an open window and vomit, so he stopped the car to make sure the passenger was all right.  7 S.W.3d 
at 149-50.  The Texas Court of Criminal Appeals recognized the community caretaking exception in this case and developed the list of factors.  
Id
. at 152.  The appellate court subsequently applied the factors and concluded that the exception did not apply in that case, primarily because nothing indicated that the passenger’s condition was “any more serious than an upset stomach.”  
Wright
, 18 S.W.3d at 247; 
accord Andrews v. State
, 79 S.W.3d 649, 652 (Tex. App.—Waco 2002, pet. ref’d).

In 
Corbin
, a police officer on the interstate at 1 a.m. saw a car briefly drift

across the side stripe along the shoulder of the road while traveling below the speed limit, and followed it for a little over a mile without seeing any violations, before turning on his overhead lights.  85 S.W.3d at 274-75.  The driver pulled over, and the officer asked him to step out of the car and patted him down. 
 Id
. at 275.  The court stated that the officer’s belief that the driver might be tired and in need of assistance was not reasonable under these circumstances because the nature and level of the distress exhibited was extremely low when the driver merely strayed momentarily over the road’s side stripe, then drove normally. 
 Id
. at 278; 
see also Eichler v. State
, 117 S.W.3d 897, 902 (Tex. App.—Houston [14
th
 Dist.] 2003, no pet.) (holding that driver’s single swerve over interstate’s white hash-marked line in light traffic after midnight did not justify applying community caretaking exception).

In contrast, the community caretaking exception has been held to apply in situations in which an officer sees distress characterized by a motorist driving in an unusual manner.  
See, e.g., Lebron v. State
, 35 S.W.3d 774, 777 (Tex. App.—Texarkana 2001, pet. ref’d) (applying exception when officer found motorist slowly driving away from reported accident on two flat tires before coming to a full stop on the roadway)
.  It has also applied to situations in which police find a driver parked on the side of the road.  
McDonald v. State
, 759 S.W.2d 784, 785 (Tex. App.—Fort Worth 1988, no writ.) (adopting exception when driver sat in parked car on highway’s shoulder, slumped over steering wheel).

Officer Box’s decision to stop and check on the SUV arose from a concern that the SUV was stranded because it had its hazard lights on, as well as concern for the passenger whom he saw partially inside and outside of the SUV.  Therefore, the evaluation of distress here turns on how hazard lights are interpreted, in addition to any concern for passenger well-being.  
Cf. Wright
, 18 S.W.3d at 247.

Hazard lights are used to alert other motorists to the presence of a stopped car.  
See, e.g., Allen v. Knippa
, 552 S.W.2d 528, 533-34 (Tex. Civ. App.—Corpus Christi 1977, writ dism’d) (discussing duty to warn approaching motorists of stopped vehicle’s presence on roadway).  They can be used for identification purposes. 
 See, e.g.
, 
Brother v. State
, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005)
 (noting that 911 operator instructed witness of drunk driving to turn on hazard lights to identify his vehicle to officers), 
cert. denied
, 126 S. Ct. 1172 (2006).  They can also be used to indicate some form of automobile-related distress. 
 See, e.g., Lane v. State
, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989) (describing robbery case in which undercover officer had hazard lights flashing, car’s hood open, and was parked on roadside, posing as a stranded motorist)
.
(footnote: 12)
 Here, around midnight, Officer Box saw the SUV’s hazard lights and a rear passenger partially outside of the SUV.  On his approach, he saw vomit near the rear passenger’s location.  
Officer Box’s initial view of the SUV’s activated hazard lights would tend to indicate to a reasonable person that Appellant and the SUV’s passengers were facing some sort of automobile-related distress. 
 See Lane
, 763 S.W.2d at 786.  When combined with the passenger’s initial position, half inside and half outside of the SUV with legs protruding, and the late hour, Officer Box could have reasonably concluded that this was a high level of distress and that the SUV’s occupants required his assistance.  This conclusion was reinforced when he saw the passenger’s vomit as he approached the SUV.  
Cf. Wright
, 18 S.W.3d at 247; 
Andrews v. State
, 79 S.W.3d at 652. Therefore, even though hazard lights can be used to indicate more than just distress, 
see Brother
, 166 S.W.3d at 257, we conclude that the nature and level of distress exhibited here, under these circumstances, was high enough to necessitate investigation.  The other factors, providing context for the first, tend to support the reasonableness of Officer Box’s actions.  
See Corbin
, 85 S.W.3d at 277.

Regarding the second factor, location, Appellant’s SUV was initially parked along the curb of the apartment complex’s driveway.  Stopping in the driveway instead of pulling into a designated parking space could tend to indicate some sort of distress.
(footnote: 13) 
 See, e.g., Chilman v. State
, 22 S.W.3d 50, 55 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d) (holding that exception was satisfied when driver was parked where people normally do not park; driver

also appeared confused by campus barrier, at 2 a.m., in a relatively isolated area, and would present a danger to others if he removed or disturbed the barrier).

The third factor, access to other assistance, also tends to favor the reasonableness of Officer Box’s actions.  While the complex parking lot had multiple vehicles parked in it, and the SUV itself contained three people, because of the lateness of the hour, Officer Box could have reasonably concluded that Appellant required his assistance.
(footnote: 14)
 Finally, regarding the extent to which an individual without assistance would present a danger to herself or others, 
the risk of danger correlates to the nature and level of distress reasonably perceived. 
 
Here, the high level of distress indicated by the SUV’s hazard lights and the passenger’s position leads us to conclude that there was a proportionately high level of risk
.

In the community caretaking distress spectrum, the most severe distress tends to involve solo drivers in some sort of trouble, 
see McDonald
, 759 S.W.2d at 785, 
and the least severe tends to involve no apparent distress besides a momentary drift across the road’s side stripe, 
see Corbin
, 85 S.W.3d at 278.  The facts here fall closest to the severe end of the spectrum, because although Appellant was not alone in the SUV, it was not unreasonable for Officer Box to presume distress after viewing an SUV with its hazard lights on and a passenger partially outside the vehicle, in an apartment complex driveway after midnight.  We overrule Appellant’s sole point.

CONCLUSION

Because we hold that Appellant’s motion to suppress was properly denied, we affirm.

DIXON W. HOLMAN

JUSTICE 

PANEL F:  CAYCE, C.J.; LIVINGSTON and HOLMAN, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:
  November 16, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
Officer Box testified that he did not recall whether the curb where he first noticed the SUV was marked as a fire lane.

3:
The record does not reflect the exact positioning of Officer Box in relation to the SUV and the passenger door at the time that he saw the SUV.  

4:
Officer Box’s testimony reflects that he could not recall whether he turned on his vehicle’s full lights or just the rear deck lights.

5:
Officer Box’s testimony indicates that the call to dispatch did not result, to his knowledge, in any hits or warrants out on the SUV.

6:
The record does not reflect whether Officer Box was still in his vehicle or on foot when he noticed the puddle of vomit, merely that he saw it as he “approached the vehicle and made contact with the driver.”

7:
Officer Box testified that the puddle was “in the vicinity of where the individual from the rear of the vehicle was placed.”

8:
The State stipulated at the suppression hearing that this was a warrantless-arrest issue.

9:
The trial court did not file written findings of fact and conclusions of law. 

10:
Although unpublished opinions have no precedential value under rule 47.7, we note that this court has examined the distinction between “encounters” and other police-citizen interactions in several recent opinions on similar facts.  
See
 
Tex. R. App. P. 
47.7; 
State v. Carter
, No. 02-04-00063-CR, 2005 WL 2699219, at *1 (Tex. App.—Fort Worth Oct. 20, 2005, pet. ref’d) (mem. op.) (not designated for publication) (holding that investigative detention occurred when officer activated his vehicle’s strobe lights); 
Statzel v. State
, No. 02-04-00402-CR, 2005 WL 1542673, at *1 (Tex. App.—Fort Worth June 30, 2005, no pet.) (mem. op.) (not designated for publication) (holding that merely an encounter occurred because activation of officer’s emergency lights after driver had already pulled off the road was equally consistent with safety purposes); 
Cervas v. State
, No. 02-04-00463-CR, 2005 WL 794384, *1 (Tex. App.—Fort Worth Apr. 7, 2005, no pet.) (mem. op.) (not designated for publication) (holding encounter occurred when driver, whose car was already partially in a ditch with a flat tire, voluntarily rolled down his car window to speak to approaching officer).

11:
A detention may occur when a person in a parked car complies with a police order to roll down the window or open the door.  
Ebarb v. State
, 598 S.W.2d 842, 850 (Tex. Crim. App. 1979) (noting that a “stop” has no more to do with a person’s prior motionlessness than a “frisk” has to do with his prior friskiness).  However, the physical location of the parked car may also have an impact on whether the police order alone constitutes a stop instead of an encounter. 
 See Merideth v. State
, 603 S.W.2d 872, 873 (Tex. Crim. App. 1980) (holding that officer’s knocking on driver’s window was not a stop, but became one only after driver opened the door and officer detected odor of marijuana); 
Bryant
, 161 S.W.3d at 762 (stating interaction between officer and driver did not become a stop until after driver opened his car door); 
Ashton v. State
, 931 S.W.2d 5, 7 (Tex. App.—Houston [1st Dist.] 1996, pet. ref’d) (stating that the interaction was an encounter when officer requested that driver roll down her window).  In 
Ebarb
, the car was parked in a private driveway.  598 S.W.2d at 843-44.  In 
Ashton
, in contrast, the driver was parked along the side of a street.  931 S.W.2d at 6.  In
 Bryant
, the driver had pulled into the parking lot of a strip shopping center and then onto a drive that separated two sets of buildings in the shopping center, turned around, stopped between the buildings, and turned his headlights off before the officer approached and knocked on the car window.  161 S.W.3d at 760.  In 
Merideth
, the investigation took place in an apartment complex parking lot after the officer received a call to investigate several people around parked cars in the apartment complex parking lot, at 3:00 a.m., and the police had been receiving burglary calls with regularity in that area.  603 S.W.2d at 873.

12:
Lane
, in its many incarnations, addressed a number of issues involved in a robbery conviction.  
See, e.g., 
828 S.W.2d 764, 765 (Tex. Crim. App. 1992).  We cite it here merely for the example of how the hazard lights were used.

13:
The community caretaking exception has applied when a vehicle is found parked by the side of a road.  
See McDonald
, 759 S.W.2d at 785.  It has applied when a vehicle was parked in a deserted, high crime, or high drug-traffic area, or the parking lot of a business closed for the night.  
See Morfin v. State
, 34 S.W.3d 664, 667 (Tex. App.—San Antonio 2000, no pet.) (holding exception applied when car was parked in dark, high-crime area); 
Cunningham v. State
, 966 S.W.2d 811, 813 (Tex. App.—Beaumont 1998, no pet.) (holding that exception applied when driver had flat tire, late at night, in unsafe neighborhood, driving at unsafe speed).

14:
Officer Box testified that when he first observed the SUV, he did not know whether anyone in it knew someone who lived in the complex.